365 F.Supp. 637 (1973)
Herman A. BOLL, Plaintiff,
v.
FEDERAL RESERVE BANK OF ST. LOUIS, Defendant.
No. 72 C 143(A).
United States District Court, E. D. Missouri, E. D.
September 28, 1973.
*638 *639 Sanford Goffstein, St. Louis, Mo., for plaintiff.
Kathryn J. More, Atty., Federal Reserve Bank of St. Louis, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
HARPER, District Judge.
This is an action in two counts brought by plaintiff, Herman A. Boll, against defendant, Federal Reserve Bank of St. Louis, alleging violations of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq., hereinafter referred to as the Act. Under Count I of the amended complaint plaintiff seeks compensation for overtime which he alleges was not paid to him as required by 29 U.S.C. § 207, and seeks liquidated damages as provided in 29 U. S.C. § 216(b). Under Count II, plaintiff seeks damages for wrongful discharge under 29 U.S.C. § 215(a)(3), plus reinstatement and back pay.
The testimony discloses that plaintiff began working for defendant on June 10, 1968, as an assistant examiner. When plaintiff was interviewed for his job the salary orally agreed upon was $720.00 per month. Three days after plaintiff began working for defendant, a contract (Ex. 3) was presented to him. Plaintiff went to a vice president of the bank, who explained the provisions of the contract to plaintiff, and plaintiff signed the contract, which was dated June 10, 1968. The contract was a "Belo" contract, named after the type of contract approved by the Supreme Court in Walling v. A. H. Belo, 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716 (1942).
The contract provides in part:
"* * * the parties agree (1) that the number of hours used in computing the Assistant Examiner's weekly salary shall be taken to be either forty-five *640 hours or the number of his hours of actual work, whichever is larger, and (2) that the Bank will pay him at the rate of $3.40080971 an hour for the first forty hours used in computing his weekly salary and at the rate of $5.10121456 for all hours in excess of forty."
Salaries were stated to employees working under a Belo contract in terms of an annual salary, but the assistant bank examiners who worked irregular working hours were hired under a contract which specified hourly rates and were guaranteed a minimum number of hours each week. The regular hourly rate of pay and the overtime rate of pay were calculated from the stated yearly salary. Forty hours per week for a year, exclusive of overtime hours (2,080 hours), was added to the minimum number of overtime hours agreed to be paid (260 hours) and, since overtime hours count as time and a half, one-half of the overtime hours (130 hours) was also added. The resulting total (2,470 hours) was then divided into the stated annual salary and the resulting figure was the regular hourly rate of pay. The overtime rate of pay was then calculated by increasing the regular hourly rate of pay by fifty percent.
Each year there was an annual review of salaries by defendant. Plaintiff received a raise each year effective July 1st. Plaintiff's salary was $8,640.00 per year from July 1, 1968, $9,960.00 per year from July 1, 1969, $10,860.00 per year from July 1, 1970, and $11,820.00 per year from July 1, 1971. Plaintiff testified that he was never called in to discuss these raises and that he signed Belo contracts soon after July 1st of each year.
Plaintiff, as an assistant examiner, assisted in examinations of defendant's state member banks. These member banks are located in seven different states. Approximately seventy-five percent of an assistant examiner's working time is spent outside of defendant's St. Louis office examining member banks. The schedule of banks to be examined is made at the beginning of each year. The determination of which individuals will examine a particular bank is made several months in advance of the examination. The individuals learn that they will examine a particular bank about two weeks prior to the examination.
Inspection of a bank usually begins on a Monday at the hour that the bank closes. The bank examiner and assistant bank examiners usually travel on Mondays from St. Louis to the town where the bank is located. The trip begins on Sunday when the distance of the bank from St. Louis is such that it would be impractical to make the entire trip on Monday. When an examining group arrives, before the bank examination can begin the assistant examiners are allowed to do whatever they want. The only restriction placed upon the assistant examiners is that they are to stay a reasonable distance from the bank to be examined so that their presence will not become known to the bank.
The examiner makes the decision as to the time he and the assistant examiners leave from St. Louis and as to the mode of travel. The examiners and assistant examiners normally travel either by airplane or in an automobile furnished by defendant. If an automobile is used, defendant has a policy of discouraging driving by assistant examiners on overtime status when there is an examiner available to do the driving. If an examiner is not available the assistant examiners should divide the required driving time. Defendant pays assistant examiners for all the time they spend driving defendant's automobiles, and also for all the time they spend as passengers during the normal office hours, 8:30 a. m. to 4:30 p. m., and during the hours from 11:00 p. m. to 7:00 a. m.
The week beginning July 18, 1971, plaintiff assisted in the examination of a bank in Hopkinsville, Kentucky. Previous to this time management inventory forms (Ex. 10) filled out by various examiners had, for the most part, described plaintiff's work as being satisfactory. The most recent management *641 inventory form introduced into evidence was filled out on July 13, 1971. Several of these forms described plaintiff as having a "hot" or "quick" temper.
Plaintiff filed a time report upon his return from Hopkinsville, in which he claimed seven compensable overtime hours (beyond the 45 hours), of which 2½ hours were not disputed. All compensable overtime hours claimed by an assistant examiner must be approved by the examiner in charge. Rolla T. Reed, the examiner in charge at Hopkinsville, did not approve the time report submitted by plaintiff. Reed sent a letter (Ex. 5) to plaintiff, which stated in part:
"The one and a half hours of time shown for travel hours on Sunday, July 18, 1971, is not compensable if there are hotel or motel accommodations available, and if you don't reach them by 11:00 p. m. then you are traveling at your own desires. The question of driving hours is also an item of question. It has been the policy that driving time shall be shared or in known cases involving overtime that if there are examiners in the automobile then they shall do the driving, unless they are physically handicapped or there is some extenuating circumstances. Since the normal driving time to Hopkinsville is between five and six hours, the question of your driving three hours on return trip after you went on overtime status has raised the question of adhering to a policy and propriety of such action."
After receiving this letter, plaintiff resubmitted his time report without change to Edgar H. Crist, Chief Examiner, setting out plaintiff's interpretations of the circumstances surrounding the disputed 4½ hours. Crist returned the time report to plaintiff for "appropriate revision and submission." Plaintiff then went to see Crist, who sent plaintiff to Harold E. Uthoff, vice president and head of the examination department. Uthoff did not approve the compensable overtime hours reported in plaintiff's time report. Plaintiff, in accordance with defendant's procedure for such disputes, requested an investigation of the dispute by Eugene A. Leonard, first vice president. In a memorandum dated September 23, 1971 (Ex. 6), Leonard upheld plaintiff's contention that he was entitled to the overtime.
In regard to the hour and a half claimed for travel after 11:00 p. m. on July 18, 1971, the memorandum stated:
"In my judgment, Mr. Boll probably was not in fact traveling at his own desires, since an Assistant Examiner would have no alternative but to agree to the travel arrangements as proposed by those in a senior position. In addition, the unwritten policy of the department not to count travel time after 11:00 p. m. under these conditions is questionable, since such a procedure is at odds with the printed instructions on the time sheet furnished assistant examiners by the department. Accordingly, while Mr. Boll probably doesn't deserve very high marks for his cooperative spirit in this matter, I would be inclined to agree that he is technically entitled to record this 1½ hours as compensable time."
In regard to the other three hours of disputed overtime the memorandum stated:
"In this particular instance, Mr. Boll was on overtime status because of the number of hours worked in connection with this particular bank examination job. The Bank Examination Department has a practice of discouraging driving by an assistant examiner while on overtime status when there is an examiner (exempt by the Wage and Hour Law) available in the automobile to do the driving. Mr. Harold Welkener, a Senior Examiner, did ask to drive during the portion of the trip which Mr. Boll has recorded as driving hours. Mr. Welkener states that while stopped for gas he had possession of the keys to the car but that they were taken from him by Mr. Boll who announced that he was *642 going to drive. Mr. Boll in his complaint acknowledges that Mr. Welkener did ask to drive, but that he (Mr. Boll) `not being certain of "company policy" rumored to forbid compensable overtime driving by an Assistant Examiner when an Examiner is available' nonetheless completed the driving.
"According to Counsel, this fits into the category of work not requested but nevertheless `suffered' or `permitted.' Under these circumstances then, it must be counted. I would conclude that, while Mr. Boll may be guilty of insubordination, he is, under the circumstances, technically entitled to compensation for these three `hours worked.'"
This section of the memorandum headed "In conclusion" stated in part:
"In bringing the matter up in this way, Mr. Boll has properly exercised his right as an employee under our bank's personnel policy. In doing so, however, he has certainly done nothing to endear himself to his fellow examiners and superiors, and even though the quality of his work is acceptable the department management could hardly be blamed if they were to question his value as a member of a team in which cooperation is essential."
Sometime during September, 1971, Uthoff spoke to Francis G. Russell, Jr., vice president in charge of personnel and chief counsel of defendant. Uthoff complained that plaintiff showed no respect for him or for his instructions. The complaints of Uthoff did not relate to the complaint filed by plaintiff. On February 7th or 8th, Uthoff and Crist came to Russell's office. They told Russell that they had concluded the annual year-end review of the assistant examiners with the examiners. Uthoff and Crist reported that the opinion of the examiners, based upon the examiner's experience, was almost uniformly that, while plaintiff did technically competent work, he was unable to cooperate with his fellow employees and caused irritating incidents with the bankers whose banks were being examined. The examiners mentioned as holding this opinion of plaintiff were Messrs. Burda, Carr, Welkener, Archer, Page, and several others.
Plaintiff was discharged on February 11, 1972. The decision to terminate plaintiff was made by defendant's Management Council. The Management Council is composed of the president, first vice president, and senior vice presidents, approximately ten persons in all. The recommendation to terminate plaintiff was made by Russell. Russell testified that he made the recommendation on the basis that plaintiff's basic temperament was unsuited for the type of work he did, in that plaintiff was unable to get along with the bankers he helped examine. At the meeting of the Management Council, Uthoff went over the review of the bank examiners. Uthoff also mentioned the complaint plaintiff made to Leonard. Russel testifies that the complaint had nothing to do with the decision of the Management Council.
After defendant discharged plaintiff, plaintiff found employment on July 5, 1971, at $700.00 per month. He remained in that job until January 31, 1973. Plaintiff found employment a second time on February 12, 1973, at $650.00 per month.
Plaintiff's contention under Count I is that, in violation of 29 U.S.C. § 207(a), defendant paid him for the overtime hours he worked at a rate less than one and one-half times the regular rate at which he was employed. Section 207(a)(1) provides:
"Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation *643 for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."
Plaintiff contends that his hourly pay rate is based on a 37½ hour week, and that he was entitled to pay for any hours worked in any week in excess of 37½ hours, the first 2½ hours at regular rate, and any hours in excess of 40 at time and a half. To arrive at his claimed hourly rate he has divided his yearly salary by 52, times 37½ hours.
During the trial Plaintiff's Exhibit 2 was introduced, which purports to show the amount of time plaintiff worked, which in turn reflects the hours for which he was not compensated as required by the Act. Exhibit 2 also contains plaintiff's calculations of the amount he claims is due to him under the Act. Exhibit 2 was prepared based on the plaintiff's contention with respect to the hourly pay rate he says applies and not the hourly rate set out in the written contracts. Plaintiff testified that he made Exhibit 2 based upon his time reports (a part of Plaintiff's Exhibit 3), and his travel expense vouchers (Ex. D), both of which he examined at the bank, and daily records which he kept. Plaintiff divided the hours he allegedly worked into nine categories. The category "Hours Reported" represents the hours taken from the weekly time report prepared, signed and furnished to the bank by the plaintiff for each of the weeks referred to (a part of Ex. 3). The category "Travel Time Applicable" represents the time between the hours of 7:00 a. m. and 8:30 a. m. and the hours of 4:30 p. m. and 11:00 p. m. when plaintiff was traveling for defendant outside of St. Louis but was not driving a car. The category "Holiday Hours" reflects the normal office hours which were not worked because of holidays. The category "Standby Time" reflects the time plaintiff spent waiting to start bank examinations when he arrived at his destination before the examination was to begin. The category "Personal Convenience Allowance" represents time, other than vacations, for which plaintiff was paid even though he did not work. The categories "Time Report Preparation", "Expense Voucher Preparation", and "Preliminary Preparatory Time" represent hours not included in plaintiff's time reports allegedly worked by plaintiff in filling out reports and vouchers or preparing for an examination. The category "Auto Handling" reflects time spent by plaintiff picking up or returning a company car.
Plaintiff testified that the times listed under "Time Report Preparation", "Expense Voucher Preparation", "Preliminary Preparatory Time" and "Auto Handling" were approximations. Plaintiff further testified that all preliminary preparation time was spent at the bank. Defendant, through the use of the bank's sign-in sheets (Exhibits A, B and C), showed that plaintiff had not been to the bank during the week beginning January 17, 1971, a week in which plaintiff claimed one hour preparatory time. During the weeks of May 9, 1971, and August 1, 1971, for which plaintiff also claimed one hour preparatory time, plaintiff was at the bank for 12 minutes and 16 minutes, respectively.
The first question for the Court is to determine the proper hourly pay rate for the plaintiff. Was it as set out in the contract or as contended by the plaintiff and used in preparing Plaintiff's Exhibit 2?
Walling v. A. H. Belo Corporation, supra, held, where a contract specified an hourly rate and not less than time and a half for overtime, with a guaranty of a fixed weekly sum, and required the employer to pay more than the weekly guaranty where the hours worked at the contract rate exceeded that sum, that the specified hourly rate was the regular rate. Section 207(f) 29 U.S.C., reiterates the criteria set out in Walling v. A. H. Belo Corporation, by providing:
"No employer shall be deemed to have violated subsection (A) of this section by employing any employee for a workweek in excess of the maximum *644 workweek applicable to such employee under subsection (a) of this section if such employee is employed pursuant to a bona fide individual contract, or pursuant to an agreement made as a result of collective bargaining by representatives of employees, if the duties of such employee necessitate irregular hours of work, and the contract or agreement (1) specifies a regular rate of pay of not less than the minimum hourly rate provided in subsection (a) or (b) of section 206 of this title (whichever may be applicable) and compensation at not less than one and one-half times such rate for all hours worked in excess of such maximum workweek, and (2) provides a weekly guaranty of pay for not more than sixty hours based on the rates so specified."
Therefore, if the criteria set out by Section 207(f) are met there is no violation of Section 207(a). Furthermore, even if the contract does not meet these criteria, the method used by plaintiff to calculate the regular rate is incorrect. Since plaintiff was hired for a job that entailed variable or fluctuating hours, the regular rate would have to be computed separately for each week. See Overnight Motor Transportation Co., Inc. v. Missel, 316 U.S. 572, 580, 62 S. Ct. 1216, 86 L.Ed. 1682 (1942).
Plaintiff contends that his contract does not meet the criteria of Section 207(f) because there was no bona fide contract, the duties of plaintiff did not necessitate irregular hours of work, and the contract did not provide a weekly guaranty of pay.
The Interpretive Bulletin of the Department of Labor states in 29 CFR § 778.407, a section addressed to the nature of a section 207(f) contract:
"The employee must not only be aware of but must have agreed to the method of compensation in advance of performing the work. * * * Furthermore, the contract must be `bona fide'. This implies that both the making of the contract and the settlement of its terms were done in good faith."
The weight which a court should give interpretive bulletins was set out in Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), as follows:
"We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."
The Court has considered the portion of § 778.407 cited above and the sections of the interpretive bulletin and the opinions by Wage-Hour Administrators cited hereinafter, and considers them to be reasonable interpretations of the Act.
Plaintiff, himself, testified that the provisions of his initial contract with defendant were explained to him three days after he began working for defendant. Plaintiff signed the contract. Therefore, as of June 13, 1968, plaintiff was aware of and had agreed to the method of compensation in advance of performing any subsequent work for defendant. What plaintiff's regular rate of pay was before June 13, 1968, need not be considered as it is beyond the Statute of Limitations for actions brought under the Act. 29 U.S.C. § 255. There was no evidence from which the Court could draw the conclusion that the making of the contract and the settlement of its terms were not done in good faith.
Section 778.406, 29 CFR, provides that "[a]ny employment in which the employee's hours fluctuate only in the overtime range above the maximum *645 workweek prescribed by the statute lacks the irregularity of hours for which the Supreme Court found the so-called `Belo' contracts appropriate and so fails to meet the requirements of section 7(f) * * *."
The maximum workweek prescribed by the statute is forty hours. 29 U.S.C. § 207(a). Plaintiff's own calculations of the hours he worked (Ex. 2) shows that his workweeks varied above and below forty hours. The hours plaintiff worked were sufficiently irregular for the Belo contract to be appropriate.
Section 778.405, 29 CFR provides:
"Even if an employee does in fact work a variable workweek, the question must still be asked whether his duties necessitate irregular hours of work. The subsection is not designed to apply in a situation where the hours of work vary from week to week at the discretion of the employer or the employee, nor to a situation where the employee works an irregular number of hours according to a predetermined schedule. The nature of the employee's duties must be such that neither he nor his employer can either control or anticipate with any degree of certainty the number of hours he must work from week to week."
Plaintiff contends that because defendant established the schedule of banks to be examined at the beginning of each year and determined several months in advance of examination which individuals were to examine particular banks, the hours of work varied from week to week at the discretion of the employer, and plaintiff worked irregular hours according to a predetermined schedule.
It is evident that the above quoted portion of Section 778.408 is directed at situations where the irregular hours of an employee are the result of the discretion of an employer or employee or where the hours an employee works can be ascertained from a predetermined schedule. The evidence discloses that while the examination of banks was scheduled ahead of time, the number of hours that would be required to complete an examination was not known by defendant. Although defendant would obviously know that the examination of a large bank would probably require more time than the examination of a smaller bank, the number of hours the assistant examiners would work during a particular examination could not be controlled by defendant nor could the number of hours they would work be anticipated with any degree of certainty. Thus, the number of hours plaintiff worked per week were not the result of the discretion of defendant nor were they ascertainable from the schedule of the order in which the banks would be examined. Plaintiff's duties necessitated irregular hours of work.
The contention that the written contract between plaintiff and defendant did not provide a weekly guaranteed wage is without merit. Although the contract does not contain a figure specifically designated as plaintiff's weekly guaranteed wage, the contract provides that the minimum number of hours used in computing plaintiff's weekly salary will be forty-five hours and provides the rate of pay for the first forty hours worked and the rate of pay for hours worked in excess of forty. Thus, the contract, a legally enforceable contract, does provide a weekly guaranteed wage which can be ascertained by simple computation.
The plaintiff's contention as to hourly pay rate is without merit. The proper hourly pay rate is set out in the written contracts (parts of Plff's Ex. 3) and is the hourly pay rate to be used with respect to the hours plaintiff either worked, or forty-five hours, whichever is larger, in any one week, in determining his weekly pay.
It is undisputed that plaintiff was paid for the hours reported by him each week as worked, or forty-five hours, whichever was larger, at the hourly pay *646 rate set out in the contracts for the period of time he was employed.
We now turn to the question of whether the plaintiff worked more than forty-five hours in any one week for which he was not paid after March 10, 1970 (this suit was filed March 10, 1972).
Plaintiff's Exhibit 2 categorizes time which plaintiff alleges was compensable under the Act. The category containing the largest amount of allegedly compensable time other than "Hours Reported" was "Travel Time", being time traveled as a passenger outside the normal office hours of defendant, and between 7:00 p. m. to 8:30 p. m. and 4:30 p. m. to 11:00 p. m.
Section 785.39, 29 CFR, which pertains to "Travel away from home community," provides that travel away from home is worktime when it cuts across an employee's workday and states that "[a]s an enforcement policy the Division will not consider as worktime that time spent in travel away from home outside of regular working hours as a passenger on an airplane, train, boat, bus or automobile." This section leaves open the question of whether passenger travel outside of working hours is compensable time. However, an opinion signed by Wage-Hour Administrator Clarence T. Lundquist on July 10, 1962, WHM 93:313, stated in part:
"Your question concerns a bank employee, who is an outside collector, and who occasionally is assigned to travel by plane on a two or three day trip to another state to repossess an automobile and drive it back to the bank. You wish to know how much of the time after the employee leaves for the airport until he returns the repossessed car to the bank is considered hours worked.
"Where an employee is required to travel by common carrier away from his usual place of business and remain overnight, all time spent in travel on any of the seven days of the workweek which correspond to his normal working hours must be counted as working time whether or not it is performed on a usual working day. * * * Time spent in travel by common carrier outside the normal working hours on any of the seven days of the workweek is not regarded as working time provided the employee performs no work and is free to relax during those hours."
Furthermore, in the court decisions this Court has found which deal with travel situations similar to plaintiff's, none of the courts have held that passenger travel time outside of working hours was compensable. See Walling v. Mid-Continent Pipe Line Co., 143 F.2d 308 (10th Cir. 1944); Chepard v. May, 71 F.Supp. 389 (S.D.N.Y.1947); American Newspaper Guild v. Republican Publishing Co., 8 WH Cases 140 (D.Mass. 1948), aff'd, 172 F.2d 943 (1st Cir. 1949). The Court concludes that defendant is not required by the Act to pay plaintiff for the travel time listed in Exhibit 2.
Plaintiff testified that the category "Auto Handling" includes the time he spent driving defendant's automobiles while picking up and delivering them. Plaintiff offered no evidence to support his claim that he was not compensated for the hours listed under this category. A number of the time reports filled out by plaintiff includes the category "Driving Time" as a part of his reported hours. Plaintiff prepared these reports near the time of the events they describe. The Court is of the opinion that the hours listed on plaintiff's time reports in the category "Driving Hours" truly reflect the time plaintiff spent driving defendant's automobiles. Therefore, plaintiff is not entitled to compensation for the hours listed as "Auto Handling" in Exhibit 2.
The Act does not require defendant to pay plaintiff for the holiday hours and personal convenience time he listed in Exhibit 2. As stated in an opinion signed by Wage-Hour Administrator *647 Clarence T. Lundquist on August 31, 1962, WHM 94:674:
"There is no provision in the Fair Labor Standards Act which requires the payment by employees for absence from work for vacation, holidays, illness, or any other reason. The granting of leaves of absence with or without pay is a matter of agreement between the employer and the employee, and the time need not be counted as working time."
Plaintiff contends that defendant's Employee's Guide provides for payment for these items. Even if the Employee's Guide were a part of the contract between plaintiff and defendant, the failure to pay plaintiff for holidays and personal convenience time would not constitute a violation of the Act. However, if we consider holiday hours claimed on Exhibit 2 since March 10, 1970, there are only four instances with this time and other time that exceed 45 hours of work in a week. If we do not consider travel time, which is discussed and disallowed above, in only one week (9/6/70) is there more than 45 hours involved. The details of this week will be discussed in detail later.
Plaintiff claims a total of 8 hours 15 minutes of "Standby Time". Whether this time is compensable is a question of fact to be resolved by the Court in the light of all the circumstances. Skidmore v. Swift & Co., supra. Section 785.16(a), 29 CFR, states:
"Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked. He is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived. Whether the time is long enough to enable him to use the time effectively for his own purposes depends upon all of the facts and circumstances of the case."
When an examining group arrived early in a town in which a bank was to be examined, the examiners were allowed to do whatever they wanted. The only restriction placed upon the examiners was that they were to stay a reasonable distance from the bank to be examined. Contrary to plaintiff's contentions, this restriction was not sufficient to make the "Standby Time" compensable. The examiners were able to use their time effectively for their own purposes. If this time were allowed, the 8¼ hours claimed was in four different weeks. The total compensable hours claimed by the plaintiff, including this time, is only over 45 hours for the week of 1/30/72. If we take from the claimed 47½ hours travel time of 1¾ hours, it leaves 45¾ hours. This week will be discussed in detail later.
Time reports and expense vouchers were placed in evidence and plaintiff testified that they had been prepared on his own time. Defendant introduced no evidence to the contrary. Plaintiff also testified that he had to prepare for bank examinations and that the time he spent in this preparation was spent at the bank. This time was not included in plaintiff's time reports, although the time reports provided for the inclusion of all hours spent in the office. Plaintiff listed on Exhibit 2 his approximation of the time he spent during each particular week preparing the time reports and expense vouchers and preparing for bank examinations. Defendant placed sign-in sheets in evidence which showed that plaintiff's approximations of the time he spent in the bank on weekends grossly exaggerated the time he actually was there on two weekends. On another occasion where plaintiff approximated that he spent one hour at the bank, plaintiff had not even been to the bank.
The sign-in sheets of the bank would provide an accurate record of any time *648 plaintiff actually spent preparing for bank examinations. Plaintiff did not introduce these into evidence but instead relied on his statement that he did extra work in preparation for examinations and his estimate of the time he spent in this preparation. Previously, plaintiff had not included this time on his time reports which provide for the listing of all hours worked in the office. The sign-in sheets placed into evidence by defendant show a maximum of 16 minutes spent by plaintiff in the bank on a weekend. The Court does not consider such small amounts of time as evidence that plaintiff performed any work preparing for bank examinations. Plaintiff has not sustained his burden of proving that he in fact performed any work preparing for bank examinations.
Plaintiff did prepare his time reports and expense vouchers. He testified that these were always prepared on his own time. No evidence was introduced to the contrary. The time reports do not provide for the listing of time spent out of the office preparing such items as time reports or expense vouchers. The Court finds that plaintiff did prepare the reports and vouchers and has shown the amount of that work as a matter of just and reasonable inference. Defendant presented no evidence contrary to either of these findings.
The Supreme Court held in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-688, 66 S.Ct. 1187, 1192, 90 L. Ed. 1515 (1946):
"An employee who brings suit under § 16(b) of the Act for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated. * * *
"When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of these records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises. * * *
"In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."
Section 260, 29 U.S.C., allows the Court to absolve defendant from liquidated damages if defendant has acted in good faith. The testimony of the witness Russell evidenced the conscientious efforts made by defendant to comply with the Act. Defendant's failure to pay plaintiff for the time he expended preparing reports and vouchers was the result of that time not being listed on the time reports and not the result of any lack of good faith on the part of defendant. The Court does not believe liquidated damages would be appropriate under these circumstances.
29 U.S.C. § 255 establishes a two-year statute of limitation for actions brought under the Act with an exception allowing a three-year period when the cause of action arises out of a willful violation. As stated in Hodgson v. Hyatt, 318 F.Supp. 390, 392-393 (N.D.Fla. 1970) in reference to § 255:
"Since the Portal-to-Portal Act limitations apply to civil actions, the term `willful' which was added by the 1966 amendment must be construed in the civil sense. It therefore applies to violations which are intentional, knowing or voluntary as distinguished *649 from accidental and it is used to characterize conduct marked by careless disregard whether or not one has the right so to act."
Defendant's failure to pay plaintiff for additional overtime beyond that paid him, if any is due, was not intentional, knowing or voluntary. He was paid based on his own prepared weekly reports. Defendant's conduct was not marked by careless disregard of the requirements of the Act. As a result, plaintiff, if he recovers, may only recover those wages he was entitled to receive but was not paid subsequent to March 10, 1970.
Turning again to Plaintiff's Exhibit 2, which summarizes among other things the compensable hours claimed by the plaintiff, we find that for the period in question (after March 10, 1970), for only four weeks (August 2 and October 25, 1970, and July 18 and August 8, 1971) did the plaintiff report to the defendant that he had worked more than 45 hours, and it is undisputed that plaintiff was paid for all the hours reported in those four weeks. For the other weeks during this period he was paid for 45 hours in accordance with the contract, which the Court has previously held governs. The exhibit discloses that during the period in question there are some 32 weeks for which the plaintiff seeks total compensable hours in excess of 45, but the exhibit further discloses that in each of those weeks substantial hours are claimed for travel time for which there was no payment. As heretofore held, the travel time listed on the exhibit is not compensable time. When the travel time listed on the exhibit is disregarded, the other claimed compensable time by the plaintiff in this exhibit for the period in question in excess of 45 hours or reported hours, whichever is larger, occurs in only nine different weeks.
The nine weeks in question and time claimed in excess of 45 hours or reported hours, whichever is larger, and excessive of claimed travel time is as follows:

 Claimed
 Week Unpaid
Involved Time Involved Hours 
 8/ 2/70 ¼ hour  time report preparation ¼
 9/ 6/70 ¼ hour  time report preparation
 ½ hour  expense voucher
 preparation
 1 hour  preliminary preparatory
 time
 ½ hour  auto handling
 7½ hours  holiday time, all
 of which when added to his
 reported 37¾ hours would
 make total of 47½ hours,
 or 2½ hours involved 2½
 9/13/70 ¼ hour  time report preparation
 ½ hour  expense voucher
 preparation
 1 hour  preliminary preparatory
 time 1¾
 7/18/71 ¼ hour  time report preparation
 ½ hour  expense voucher
 preparation
 1 hour  preliminary preparatory
 time
 ½ hour  auto handling 2¼
 8/ 1/71 ¼ hour  time report preparation
 ½ hour  expense voucher
 preparation
 1 hour  preliminary preparatory
 time
 Reported 44 hours, so of this
 1¾ hours, ¾ hours would
 be more than 45 hours ¾
 8/ 8/71 ¼ hour  time report preparation
 ½ hour  expense voucher
 preparation ¾
12/ 5/71 ¼ hour  time report preparation
 ½ hour  expense voucher
 preparation
 1 hour  preliminary preparatory
 time which when added
 to his reported 43½ hours
 would make a total of 45¼
 hours, or ¼ hour ¼
12/12/71 ¼ hour  time report preparation ¼
 1/30/72 1½ hours  standby time
 ¼ hour  time report preparation
 ½ hour  expense voucher
 preparation all of which
 when added to his reported
 42½ hours would make a
 total of 45¾ hours, or ¾
 hour involved ¾
 ___
 Total Claimed Unpaid Hours 9½

The total hours claimed by the plaintiff in the nine weeks in question, exclusive of claimed travel time, for *650 which the plaintiff was not paid, is 9½ hours. When we consider the testimony of the plaintiff that the hours making up this 9½ hours are within the category which the plaintiff testified were generally only approximations, as previously discussed, and that the bank records with respect to preliminary preparatory time refute in part or in whole some of plaintiff's claims, as previously discussed, the Court is of the opinion that the plaintiff has not carried the burden to show that he is entitled to be paid for an additional 9½ hours. Further, the Court believes the principal "de minimus non curat lex" is applicable. The plaintiff has been properly paid for all the compensable hours that he worked during the period in question and is not entitled to a judgment on Count I.
Under Count II plaintiff contends that defendant violated 29 U.S.C. § 215(a) by discharging plaintiff because he had filed a complaint and was about to institute proceedings related to the Act. Defendant contends the Act does not provide a private party the right to sue for a violation of § 215(a)(3), this right being reserved to the Secretary of Labor. Fagot v. Flintkote Company, 305 F.Supp. 407 (E.D. La.1969) addressed this question, and, in a well reasoned opinion, held § 215(a)(3) may be enforced by an employee in a civil action even though the statute does not set forth a private remedy for its breach. This Court agrees with the reasoning and the holding in Fagot v. Flintkote Company.
Defendant also contends that the complaint which the plaintiff filed with the examiners and officers of the bank concerning the disputed four and one-half overtime hours was not the type of complaint protected by § 215(a)(3). The Court does not need to consider this question, for it finds that plaintiff's discharge was not the result of plaintiff's complaint concerning the disputed four and one-half overtime hours, a complaint that was settled in favor of plaintiff five months prior to his discharge, or because plaintiff was about to institute proceedings relating to the Act. The discharge was the result of year-end reports made by bank examiners which indicated that plaintiff was unable to cooperate with his fellow employees and caused irritating incidents with bankers whose banks were being examined.
The evidence introduced by plaintiff to show the discharge was for a cause other than the year-end reports of the examiners consisted only of earlier performance reports and the determination made by Leonard, in spite of the fact that plaintiff was aware of the year-end reports and the examiners who made these reports. Plaintiff argues from the prior reports, the pay raises resulting from these reports, and comments made in the determination by Leonard, that the reason for his discharge was the complaint he made concerning the four and one-half hours.
The examiners who made the year-end reports would have no reason to let their reports be influenced because of plaintiff's complaint even if they knew of the complaint. The inconsistency of the prior evaluations of plaintiff's work with the year-end reports of the examiners does not negate the fact that the year-end reports were made and that they were sufficient to justify plaintiff's discharge. The comments made by Leonard, referring to plaintiff's cooperative spirit and his value in a situation in which cooperation was essential, were explained by Leonard in a deposition which was introduced into evidence. Leonard explained that the comments referred to his dissatisfaction with the manner in which plaintiff processed his complaint rather than the fact that plaintiff processed the complaint. There is no evidence that defendant was aware of any intention on the part of plaintiff to institute proceedings relating to the Act.
The evidence does not support the conclusion that plaintiff was discharged because of his complaint or because he was about to institute proceedings related to the Act. The Court finds Russell's testimony *651 as to the reason he recommended plaintiff's termination and as to the basis of the management council's decision to discharge plaintiff to be credible.
This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law.
The clerk of the court is directed to prepare and enter a judgment in favor of defendant on both Counts I and II.